**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVE VERGARA, on behalf of himself and all others similarly situated, | Civil Action No.: |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| APPLE REIT NINE, INC. now known as APPLE HOSPITALITY REIT, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff alleges the following upon information and belief, based upon the investigation of his attorneys and upon personal knowledge, as to his former ownership of the stock of Apple REIT Nine, Inc. ("A-9") and his participation in the Dividend Reinvestment Plan ("DRIP") of A-9 during the Class Period. Apple Hospitality REIT, Inc. is the successor in interest to A-9 by virtue of the 2014 merger.

## NATURE OF THE ACTION

1.     This is a class action asserting claims on behalf of the pre-merger public common shareholders of A-9 who participated in the A-9 DRIP from April 8, 2018 through the termination and/or suspension of its DRIP (the "Class Period").

2.     During the Class Period, A-9 contracted with its unitholders to allow A-9 to provide consenting DRIP participants with "units" in lieu of the cash dividends declared. As part of the contract A-9 agreed to value the units at "fair market value" which A-9 deemed to be the last sale of units by A-9 unless the Board determined to re-evaluate the worth of the units in good faith and adjust same to be equal to fair market value.

1

3.      A-9 holders agreed to forego approximately $11 million in cash dividends in exchange for approximately 1.1 million units issued by A-9 in lieu thereof during the Class Period.

4.      For conversion purposes, A-9 valued the shares to be received in lieu of cash dividends at $10.25 share throughout the entire Class Period even though there was objective evidence that the $10.25 conversion price grossly overvalued the A-9 units.

5.      Plaintiff and the members of the Class did not receive enough A-9 shares in the DRIPs to be equal to the dollar value of the cash dividend because A-9 Defendant utilized an $10.25 valuation of shares for calculating the number of shares, which DRIP electors would receive in lieu of the declared cash dividend.

6.      A-9 was a "non-traded REIT" because its shares were never registered for trading on any exchange.  Because there was no public market for A-9 stock, Plaintiff and the Class were only allowed to exchange their cash dividends based on the exchange ratio and valuations of A-9 units set by the Defendants.  Under the mechanism created by A-9, once an A-9 unitholder made a decision to participate in the DRIP, that participation would continue automatically each month whenever A-9 declared a dividend unless the participant affirmatively rejected the DRIP.

7.      The DRIP allowed A-9 to conserve cash, a time when other Apple REITs were forced to borrow cash from A-9 in unreported related party transactions that was not properly recorded thereby inflating the reported value of A-9.  The manner in which Defendant set the DRIP value was contrary to law and to the contract made with DRIP reinvestors and overvalued the DRIP shares to DRIP reinvestors' disadvantage.  Post-Effective Amendment No. 1 to Form S-3 Registration Statement filed February 19, 2013 with Prospectus.

8.      As detailed in *In the Matter of Apple REIT Eight, Inc., et al.*, Securities &
Exchange Commission Admin. Proceeding, No. 3-15750 in the "Order Instituting Cease-And-
Desist Proceedings . . . Making Findings, And Imposing Civil Penalties ("Order"). A-9's
reported financial statements which A-9 provided to class members violated Section 13(a), 13(b
)(2)(A), 13(b)(2)(B) and 14(a) of the Exchange Act of various rules thereunder by failing to
properly report over $1 million of compensation to A-9 officers thereby overstating income and a
transfer of $20 million from A-9 to A-8 thereby overstating A-9's book value.

9.      Defendant's acts and omissions constitute a breach of contract and breach of
defendant's duty of good faith and fair dealing and have caused Plaintiff and Class members to
suffer damages.

## THE PARTIES

### A. Plaintiff

10.     Plaintiff Steve Vergara, was at all relevant times a resident of Suffolk County,
New York, was a unitholder of A-9 before it merged in Apple Hospitality REIT, Inc. in mid-
2014. During the Class Period, he elected to reinvest his A-9 dividends in A-9 rather than take
the cash offers of dividends.

### B. Defendant

11.     Defendant A-9 before its merger into Apple Hospitality REIT for 2014 was a non-
traded REIT organized under the laws of Virginia with a class of securities registered under
Section 12(g) of the Exchange Act and was subject to the reporting requirements of Section
13(a) of the Exchange Act.  A-9 raised approximately $1 billion in its various offerings from the
sale of units to the public and had approximately 20,000 beneficial unitholders.  A-9 instituted a
DRIP by filing a Form S-3 registration statement on or about December 10, 2010, which it

amended and restated on February 19, 2013. As of June 30, 2013, during the Class Period, A-9 had sold a total of approximately 1.1 million units representing approximately $11.275 million in proceeds pursuant to these DRIP offerings.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) and/or § 1332(d)(2). This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,000 and at least one Class member is a citizen of a state different from a Defendant.

13.    Venue is proper under 28 U.S.C. § 1391(a) and (b) because the DRIP shares were distributed by David Lerner Associates and Plaintiff's and class members accounts were maintained in this District. Defendant issued shares to class members in this District.

## CLASS ALLEGATIONS

14.    This action is brought by Plaintiff, for himself and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a) and b(3). Plaintiff seeks to represent the following proposed class:

> All persons and entities that elected to participate in the A-9 DRIP between April 8, 2013 through the end of A-9's Dividend Reinvestment Plan and received A-9 common stock in lieu of the declared cash dividend at a value of $10.25 per share.

15.    Excluded from the Class is Defendant and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant or any of Apple REIT's partners, subsidiaries, affiliates, or joint ventures.

16.    Numerosity. The members of the Class are so numerous and dispersed that it would be impracticable to join them individually. There were thousands of DRIP participants during the Class Period. While Plaintiff does not know the exact number of members of the

Class at this time, Plaintiff believes there are, at minimum, thousands of members. Defendant's records contain sufficient information to determine the exact number of persons in the Class.

17.    Existence and Predominance of Common Questions. Common questions of law and fact exist as to all Class members in the Class and predominate over questions affecting only individual members. These common questions include the following:

(a)    Did the terms of the contract between Class member DRIP reinvestors and A-9 require A-9 to use a valuation method other than the "redemption" price during the Class Period;

(b)    Was said contract breached by providing DRIP participants with units worth less than the value of the cash dividends;

(c)    Whether Defendant breached implied duties of good faith and fair dealing in the process of setting the value of units for DRIP purposes;

(d)    The market value of A-9 units for DRIP purposes at various times during the Class Period;

(e)    Whether A-9's contractual breaches caused Plaintiff and Class members' damages;

(f)    The amount of damage suffered by Plaintiff and Class members; and

(g)    Whether the Plaintiff and Class members are entitled to a reasonable award of attorneys' fees, interest and costs of suit.

18.    Typicality. Plaintiff's claims are typical of the claims of the members of the Class he represents because he participated in the DRIP and received DRIP shares at the same inaccurate exchange ratio in lieu of cash dividends.

19.    <u>Adequacy of Representation</u>.  Plaintiff will adequately represent and protect the interests of the Class and has no interests that conflict with or are antagonistic to the interests of Class members.  Plaintiff has retained attorneys who are experienced and capable of prosecuting class actions and complex litigation.  Plaintiff's attorneys will actively conduct and be responsible for prosecuting this litigation, and have adequate resources, experience and commitment to litigate this matter.

20.    <u>Superiority</u>.  A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and unduly burdensome for each of the individual class members to bring a separate action.  Moreover, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

21.    Class certification is also appropriate because there is a readily identifiable class on whose behalf this action can be prosecuted.  Class members are readily ascertainable from Defendant's records.  A notice of pendency or resolution of this class action can be provided to class members by direct mail, email, publication notice, or other similar means.

## SUBSTANTIVE ALLEGATIONS

**A. To Maintain Its REIT Status, The Apple Nine REIT Was Required To Distribute 90% Of Net Income As Dividends, But To Save Cash, Apple REIT Nine Devised The DRIP**

22.    A real estate investment trust, or REIT, is an entity that owns and operates income-producing real estate and distributes the income to investors.  REITs pool the capital of numerous investors to purchase a portfolio of properties that the typical investor might not be able to buy individually.  To qualify as a REIT, a company must have most of its assets and

income tied to real estate investments and must distribute at least 90% of its taxable income to shareholders annually in the form of dividends. Accordingly, if the Apple REITs wanted to exist as REITs and avoid taxes and sell shares to the public to raise capital, they were required to declare dividends in the amount of at least their (otherwise) taxable income.

23.     All of the Apple Nine REIT units originally sold for $11.00 per unit (after the first 5% was sold for $10.50 at issuance). Subsequent redemptions in later years were all made at $10.25 per share. A-9 used the redemption price to set the DRIP price and never allowed the DRIP price be changed even after it became apparent that A-9 were worth significantly <u>less</u> than $10.25 per share and after there had been recent arms-length sales at $6.25 per share and $7.00 per share.

24.     Following the close of its initial offerings, the Apple Nine REIT instituted a DRIP wherein it offered the unitholder the choice of receiving units in lieu of dividends. A-9 instituted its DRIP by filing a Form S-3 Registration Statement on December 10, 2010 and it filed a post-effective amendment thereto on February 19, 2013 ("Amended Form S-3"). SEC rules and regulations mandate the inclusion of true, accurate and complete information on specifically designated subjects and issues and on general issues relevant to the issuance of securities pursuant to the Form S-3. Each A-9 was also subject to rules and regulations of disclosure under the Exchange Act, which governed the contents of quarterly ("10-Q") and annual ("10-K") financial statements. The registration statements, amendments and prospectus therein constituted contracts between A-9 and its unitholders who participated in the DRIP.

25.     Item 5 of Form S-3 requires registrants to include a description pursuant to Item 505 of Regulation S-K of the "various factors considered in determining [the] offering price" where common equity is being registered for which there is no established public trading market.

Item 5 of Form 10-K requires registrants to furnish, pursuant to Item 201 of Regulation S-K, certain high and low bid information if the principal United States market is not an exchange, and to qualify such quotations with an appropriate explanation "[w]here there is an absence of an established public trading market."

26.     A-9 units did not trade on any securities exchange and were not liquid.  A-9 did not have sufficient controls in place to meaningfully evaluate whether changes in market conditions or other factors required changes to its valuation disclosures in its Forms S-3 and Forms 10-K.  The $10.25 redemption price thus became the "default" valuation for the DRIP shares, despite significant reliable evidence which reflected that the "fair value" and/or "market value" of A-9 units was less than $10.25/share and evidence that there were arms-length transactions for A-9 stock in 2012 at $6.25 per share in tender offers by unrelated parties wherein hundreds of thousands of shares of A-9 were tendered to the non-affiliated offerors and in early 2013 when hundreds of thousands of shares were tendered at $7.00 per share.

**B.  Apple REIT Nine's Contractual Undertaking with Plaintiff and Class Members**

29.     During the class period, the A-9 Amended Form S-3 contained statements forming the basis of the contract between A-9 and each of the DRIP participants.

30.     In a section entitled, *"How are unit prices determined?"*, the Apple REITs' Form S-3 registration statements, promised to DRIP participants that:

> The price of units purchased under the plan directly from us by dividend reinvestments will be based on the fair market value of our units as of the reinvestment date as determined in good faith by our board of directors from time to time.   Thus, unless our board of directors adopts a different method of determining market value and price for our units for purposes of this plan, the market value of our units and the unit price of units purchased from us under the plan will not be based on an appraisal or other valuation of us, our net assets, or the units, and will not necessarily reflect our value, earnings, net worth or other measures of value, but rather will be deemed equal to the most recent price at which an unrelated person has purchased our units from us.

Our units are not publicly traded; consequently, there is no established public trading market for our units on which we could readily rely in determining fair market value. Nevertheless, the board has determined that, for purposes of this plan, at any given time the most recent price at which an unrelated person has purchased from us our units represents the fair market value of our units. Consequently, unless and until the board decides to use a different method for determining the fair market value of our units, the per unit price for the plan will be determined at all times based on the most recent price at which an unrelated person has purchased from us our units. Notwithstanding the foregoing, the board of directors may determine a different fair market value and price for our units for purposes of this plan if (1) in the good faith judgment of the board an amount of time has elapsed since our units have been purchased from us by unrelated persons such that the price paid by such persons would not be indicative of the fair market value of our units or (2) our board determines that there are other factors relevant to such fair market value.

31.     In the Amended S-3, A-9 also represented:

The most recent price paid by an unrelated person to us for a unit was $10.25 on January 15, 2013 which was the most recent date a dividend was paid by the Company.

32.     The contract therefore reserved discretion in the Board to determine fair market value when the price of $10.25 was no longer indicative of the A-9 unit's fair market value.

**C.  Defendant's Bad Faith In Connection With Setting DRIP Values**

33.     Although the Forms S-3 disclosed that "the per unit price for the plan will be determined at all times based on the most recent price at which an unrelated person has purchased from us our units," the disclosures omitted to state that A-9's board determined to use the redemption price as the price for the DRIP as it later admitted in its Annual Report on Form 10-K filed with the SEC in 2014.

34.     In 2014 10-K A-9 admitted Part II Items 5:

A-9 used $10.25 ". . . for redemptions under its Unit Redemption Program with the intention of providing limited liquidity based on those interested in purchasing additional Units through the Company's Dividend Reinvestment Plan.

9

35.     A-9 knew that the $10.25 offering price was not a valid reference point for setting the DRIP value because they knew in 2012 and 2013, that A-9 unitholders were tendering significant quantities of A-9 units to tender offerors at prices of from $6.25 to $7.00.

36.     By at least early mid-2013, A-9 knew or should have known that the $10.25 per unit value was inaccurate because of substantial performance declines at A-9 in book value.

37.     From 2009 through December 31, 2013, A-9's book value steadily declined from $9.31/2009; $9.01/2010; $8.55/2011; $7.37/2012; $7.18/2013.

38.     High level officers of A-9 admitted that the Board never undertook any review of A-9 value to determine if the A-9 Drip price and the process used to ascertain the DRIP price conformed to the contractual undertaking in the S-3s.

39.     According to Glade Knight's ("Apple 9 CEO") sworn testimony in "*In The Matter of David Lerner Associates, Inc.*" File No. HO-11082-a, United States Securities and Exchange Commission on March 23, 2012, Exhibit 3, when asked about the pricing of DRIP units: "We don't price them, per se" p. 248 at 15-16.  He admitted that $____ the DRIP price was the "initial sales prices" and was "not an indication of value." *Id.* at 20-21.  Knight also admitted that none of Apple REIT boards engaged in any analysis to determine fair market value of the DRIP units. *Id.* at 252; 6-9.  Knight admitted he had never been a party to any such discussion. *Id.* 252: 10-12.

40.     According to sworn testimony of Bryan Peery, in the same proceeding, *see* Exhibit 4, the only thing the Board considered in determining fair market value of Apple REIT units was the $10.25 per share paid in the redemption program.  Tr. 532:3-12.

41.     Despite the representation in the Forms S-3 issued during the Class Period that the A-9 board of directors would determine in good faith the fair market value of the DRIP units

from time-to-time, the A-9 failed to develop or maintain sufficient procedures relating to valuation of units sold in the DRIPs. The A-9 did not establish a valuation committee or a valuation working group. Nor did they establish any formal or informal valuation guidelines, or otherwise attempt to identify relevant factors for determining fair market value.

42.     The Defendant approved a dividend reinvestment value for A-9 during the Class Period at $10.25 per share even though Defendant knew that there was no support for such a valuation, and in fact objective, reliable, verifiable information indicated the $10.25 valuation was indicative of the fair market value of the A-1 units.

43.     Consequently, A-9 for purposes of the DRIP, maintained the arbitrary price of $10.25 as the "fair market value" despite the units sold in third party tender offers at $6.25 per unit and $7.00 per unit and a dramatically declining book value for A-9 throughout the Class Period suggesting that the per unit value of the A-9 units was below $10.25.

44.     A-9 also knew that the redemption price of $10.25 per share was not indicative of fair market value because A-9 knew that demands for redemptions were running at a rate of 12 million units tendered at every redemption opportunity.

45.     By early 2013, A-9 was redeeming less than 10% of redemption requests.

**D.    DRIP Purchases**

46.     In the second quarter of 2013, after April 8, 2013, A-9 issued 1.1 million units in the DRIP exchange for $11.275 million in dividends paid to A-9 shareholders in second quarter 2013.

## COUNT I

### BREACH OF CONTRACT

47.     Plaintiff repeats and realleges each and every allegation above as if more fully set forth herein.

48.     A-9 as defined herein, issued an offer to Plaintiff and the Class, and made a contract with Plaintiff and all Class members that A-9 would issue A-9's stock in place of a cash dividend as more fully set forth above.

49.     The contract is the Form S-3, as it set forth the terms of the purchase agreement and included a signature page.

50.     This was a bargained for exchange. The consideration for the contract was Plaintiff's and Class members' promise to accept A-9 units instead of receiving their dividends in cash.

51.     A-9 contracted with Plaintiff and the Class by offering to have A-9 provide Plaintiff and Class members with an amount of A-9 stock whose fair market value was the price at which an unrelated party had last purchased A-9 units or another price to be determined by the board.  Implied as part of the contract was the agreement and undertaking to determine a fair market value for the A-9 units to be paid to Plaintiff and Class members in lieu of the dividend.

52.     A-9 breached the respective contract by failing to change the price of units to be received in the DRIP when the $10.25 per unit price was no longer indicative of the actual fair market value of the units, as required by the contract.

53.     Despite knowing that unrelated parties had purchased shares in A-9 at prices lower than $10.25 per unit, and that the book value of A-9 units was steadily declining, A-9 and its agents continued to sell units under the DRIP at the arbitrary and inflated price of $10.25.

54.    As a result of the foregoing, A-9 issued fewer shares to DRIP participants than it would have issued had the number of shares been based on a value calculated in the manner represented in the S-3.

55.    By instructing A-9 to credit them with A-9 stock in lieu of a cash dividend, Plaintiff and Class members fulfilled all their responsibilities to perform under the agreement.

56.    As a result of the breach, Plaintiff and members of the Class have been damaged in an amount representing the difference between the value of the dividend declared and paid, and the value of the A-9 stock that they received.

<u>**COUNT II**</u>

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

57.    Plaintiff repeats and realleges each and every allegation above as if more fully set forth herein.

58.    The contract(s) which is (are) the subject of the claims herein was made in Virginia and the claims for breach thereof are governed by Virginia law.

59.    In Virginia every contract contains an implied covenant of good faith and fair dealing.

60.    The contract between Plaintiff, Class members, and A-9 contained in the Form S-3, previously described herein allowed A-9 through its boards, the discretion to determine the price at which the units would be sold to Plaintiff and the Class in the DRIP.

61.    The Forms S-3s explain the discretion of A-9 through its boards, to determine the pricing of the units sold in the DRIP to Plaintiff and the class members:

> . . . The Board of Directors may determine a different fair market value and price for our units for purposes of this plan if (1) good faith judgment of the board an amount of time has elapsed since our units have been purchased by unrelated persons such that the

price paid by such person would not be indicative of the fair market value of our units, or (2) our Board determines there are other factors relevant to such fair market value.

62.     In maintaining a $10.25 per unit price throughout the existence of the DRIP program, A-9 breached the implied duty of good faith and fair dealing for the reasons set forth herein by acting dishonestly, arbitrarily and unfairly towards Plaintiff and the Class members.

63.     In the circumstances here, the implied duty of good faith is particularly important in the context of the DRIP because during the Class Period, A-9 was a non-publicly traded company for which there was no stock exchange pricing mechanism to act as an objective reference point for "fair market value."

64.     A-9 breached the implied covenant of good faith and fair dealing because A-9 declined to re-price the units, despite its knowledge of their overvaluation, and did so solely out of self-interest. Its decision not to reprice the units was arbitrary and unfair to unitholders.

65.     A-9 further breached the implied covenant by exercising its discretion unfairly, arbitrarily, and in bad faith by maintaining the $10.25 per unit cost of reinvestment when the actual fair market value of units was considerably less and also by exercising its discretion unfairly by failing to establish any procedures to re-evaluate the price of DRIP units.

66.     A-9's bad faith is also demonstrated by its answer to its own "question" in the Amended S-3:

3.     *What are the possible disadvantages of the plan?*

You should consider the possible disadvantages of the plan. First, the units you acquire under the plan are not now, and may not ever be, listed on any exchange or traded in any established market. You should be prepared to hold the units indefinitely.

Second, since the units are not listed on any exchange, the price for all units purchased under the plan will be

determined by us from time to time, rather than by market conditions, which are not readily ascertainable for the units.

67.    A-9 knew that the tender offer and purchases at $6.25 and $7.00 per unit and declining book value were a more reliable indicator of fair market value than the redemption price.

68.    As a result of the foregoing, A-9 breached the implied covenant of good faith and fair dealing under Virginia law.

69.    As a result of the breach, Plaintiff and members of the Class have been damaged in an amount representing the difference between the value of the dividend declared and paid, and the value of the A-9 stock that they received.

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative;

B.    Directing Defendant to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

C.    Awarding damages to the Plaintiff and the Class from the Defendant on each of Counts I and II.

D.    Awarding Plaintiff and the Class the costs of this action, including reasonable allowance for Plaintiff's attorneys' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

Dated: April 8, 2019

SQUITIERI & FEARON, LLP


By:    /s/ Lee Squitieri
        Lee Squitieri
32 East 57th Street
12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553