```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
STEVE VERGARA, on behalf of himself              :
and all others similarly situated,               :
                                                 :
                  Plaintiff,                     :
                                                 :     MEMORANDUM & ORDER
            -against-                            :     19-cv-02027 (DLI) (RML)
                                                 :
APPLE REIT NINE, INC., now known as              :
APPLE HOSPITALITY REIT, INC.,                    :
                                                 :
                  Defendant.                     :
----------------------------------------------------------------x
```

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Steve Vergara ("Plaintiff"), a resident of Suffolk County, New York, brings this putative class action against Defendant Apple REIT Nine, Inc., now known as Apple Hospitality REIT, Inc. ("Defendant" or "A-9"), a real estate investment trust, or REIT, organized under the laws of Virginia, asserting claims under Virginia law for breach of contract and implied covenant of good faith and fair dealing. *See*, Amended Complaint ("Am. Compl."), Dkt. Entry No. 6. Defendant moved to dismiss for failure to state a claim upon which relief can be granted. *See*, Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem."), Dkt. Entry No. 9. Plaintiff opposed the motion. *See*, Pl.'s Opp'n to Mot. to Dismiss ("Pl.'s Opp'n"), Dkt. Entry No. 13. Defendant replied. Reply in Supp. of Mot. to Dismiss ("Reply"), Dkt. Entry No. 18. For the reasons set forth below, Defendant's motion to dismiss is granted in part and denied in part.

## BACKGROUND

The following facts are taken from the Amended Complaint, and are accepted as true for purposes of this decision. Plaintiff and the putative class consist of the pre-merger public common shareholders of A-9 who participated in the A-9 Dividend Reinvestment Plan ("DRIP") from

April 8, 2013 through the termination and/or suspension of the DRIP (the "Class Period"). Am. Compl. ¶ 1. During the Class Period, A-9 contracted with its unitholders to allow A-9 to provide consenting DRIP participants with "units" in lieu of the cash dividends declared. *Id.* ¶¶ 2, 13. A-9 instituted a DRIP by filing a Form S-3 registration statement on or about December 10, 2010, which it amended and restated on February 19, 2013 (the "A-9 Form S-3"). *Id.* ¶ 13. The A-9 Form S-3 explains how the DRIP units are priced:

> "The price of units purchased under the plan directly from us by dividend reinvestments will be based on the fair market value of our units as of the reinvestment date as determined in good faith by our board of directors from time-to-time. Thus, unless our board of directors adopts a different method of determining market value and price for our units for purposes of this plan, the market value of our units and the unit price of units purchased from us under the plan will not be based on an appraisal or other valuation of us, our net assets, or the units, and will not necessarily reflect our value, earnings, net worth or other measures of value, but rather will be deemed equal to the most recent price at which an unrelated person has purchased our units from us.
>
> Our units are not publicly traded; consequently, there is no established public trading market for our units on which we could readily rely in determining fair market value. Nevertheless, the board has determined that, for purposes of this plan, at any given time the most recent price at which an unrelated person has purchased from us our units represents the fair market value of our units. Consequently, unless and until the board decides to use a different method for determining the fair market value of our units, the per unit price for the plan will be determined at all times based on the most recent price at which an unrelated person has purchased from us our units. Notwithstanding the foregoing, the board of directors may determine a different fair market value and price for our units for purposes of this plan if (1) in the good faith judgment of the board an amount of time has elapsed since our units have been purchased from us by unrelated persons such that the price paid by such persons would not be indicative of the fair market value of our units or (2) our board determines that there are other factors relevant to such fair market value.
>
> The most recent price paid by an unrelated person to us for a unit was $10.25 on January 15, 2013 which was the most recent date a dividend was paid by the Company."

Def.'s Mem. Ex. 2 at 7.[1]  The DRIP units were priced at $10.25 per unit throughout the Class Period.  Am. Compl. ¶ 5.

Plaintiff alleges that A-9 breached the terms of the A-9 Form S-3 by failing to change the price of units to be received in the DRIP when the $10.25 per unit price was no longer indicative of the actual fair market value of the units, as the A-9 Form S-3 allegedly required.  *Id.* ¶ 56.  Plaintiff further alleges that A-9 breached the implied covenant of good faith and fair dealing by exercising its discretion unfairly, arbitrarily, and in bad faith by maintaining the $10.25 per unit price when the actual fair market value of the DRIP units was considerably less, and by exercising its discretion unfairly by failing to establish any procedures to re-evaluate the DRIP unit price.  *Id.* ¶¶ 5, 68-69.

## DISCUSSION

### I.  Legal Standard

#### A.  Federal Rule of Civil Procedure 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 (2007) (citations and internal quotation marks omitted).  The plausibility standard "does not require 'detailed factual allegations,' but it demands more than [] unadorned, the-defendant-unlawfully-harmed-me accusation[s]."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  *Iqbal* requires more than "'a formulaic recitation of the elements of a cause of action.'"  *Id.* at 681 (quoting *Twombly*, 550 U.S. at 555).  Where a complaint pleads facts that are "merely consistent with a defendant's liability, it stops short of the line between possibility and

---

[1] On a Rule 12(b)(6) motion to dismiss, a court may consider a document "where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (citations and quotation marks omitted).

plausibility of entitlement to relief." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). On a motion to dismiss, a court accepts as true all well pled factual allegations and draws all reasonable inferences in the plaintiff's favor. *See Dangler v. N.Y.C. Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir. 1999). Courts may only consider the complaint itself, documents attached to or referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession, or that the plaintiff knew of when bringing suit, and matters of which judicial notice may be taken. *See, e.g.*, *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

## II. Breach of Contract

Under Virginia law, the elements of a claim for breach of contract are: (1) the existence of a legally enforceable obligation of a defendant to a plaintiff, (2) the defendant's violation or breach of the obligation, and (3) an injury or harm to the plaintiff caused by the defendant's breach. *Wood v. Symantec Corp.*, 872 F. Supp.2d 476, 481 (E.D. Va. 2012) (applying Virginia law). The parties do not dispute that the A-9 Form S-3 is a legally enforceable agreement. *See*, Def.'s Mem. at 5; Pl.'s Opp'n at 1 n.2; *Cf.*, *Moses v. Apple Hospitality REIT Inc.*, 2015 WL 1014327, at *6 (E.D.N.Y. Mar. 9, 2015) ("Regarding the DRIP at issue in this case, the Forms S-3 constituted a valid contract as the Forms S-3 set forth the terms of the purchase agreement and contained a signature page.").

Plaintiff alleges he was injured because "A-9 issued fewer shares to DRIP participants than it would have issued had the number of shares been based on a value calculated in the manner represented in the [A-9 Form] S-3." Am. Compl. ¶ 58. Accepting this allegation as true, which the Court must do at this stage, Plaintiff adequately has pled the first and third requirements of a breach of contract claim under Virginia law. Accordingly, the issue before the Court is whether

Plaintiff plausibly has alleged that Defendant's pricing of the DRIP units at $10.25 per unit throughout the Class Period constituted a breach of Defendant's obligations under the A-9 Form S-3.

### A. Failure to Determine Fair Market Value from Time to Time

Plaintiff argues that the A-9 Form S-3 required Defendant to revisit the DRIP unit price from time to time, and Defendant breached its obligations under the contract by failing to change the price of the DRIP units when the $10.25 per unit price no longer was indicative of the fair market value of the units. Am. Compl. ¶ 56; Pl.'s Opp'n at 11. In so arguing, Plaintiff repeats a breach of contract theory that twice has been rejected in prior, substantially similar, litigations involving the Apple REIT family. *See*, *Wenzel v. Knight*, 2015 WL 3466863 (E.D. Va. June 1, 2015) (putative class action against Apple REIT Eight alleging, *inter alia*, defendants' pricing of DRIP units breached its obligations under operative Form S-3); *Wilchfort v. Knight*, 307 F. Supp.3d 64 (E.D.N.Y. 2018) (putative class action against Apple REITs Six, Seven and Eight alleging, *inter alia*, defendants' pricing of DRIP units breached their obligations under operative Forms S-3).

In *Wenzel*, the court "read the entire contractual language [of the Form S-3] together," and found that "[a]ny shareholder agreeing to participate in the DRIP did so knowing the price ($11.00 per share) and the basis for that amount (it was the last price paid by an outsider)." 2015 WL 3466863, at *4. The court found that the Form S-3 "imposed no duty on the board to monitor, evaluate, or appraise the share values. Instead, it gave the board *discretionary* power to change the valuation method for DRIP shares." *Id.*, at *7 (emphasis in original).

In *Wilchfort*, a judge of this Court concurred with the reasoning in *Wenzel*, similarly finding that the operative Forms S-3 contained no enforceable obligations to revalue the DRIP shares from

5

time to time. 307 F. Supp.3d at 74-75. The *Wilchfort* court determined that "the contracts conferred *discretionary* power to the boards to reconsider the fair market value of the shares through valuation methods different from the 'most recent price at which an unrelated person has purchased [the] units.'" *Id.* at 77 (emphasis in original) (quoting *Wenzel*, 2015 WL 3466863, at *4).

Plaintiff claims the *Wilchfort* case is distinguishable because that court found ambiguity in the operative Form S-3, specifically noting, that "A-9's 'our units' language was ambiguous and, thus, Apple REIT's interpretation of the contractual obligation could not be accepted as a matter of law." Pl.'s Opp'n at 11. Even if this ambiguity was present in the A-9 Form S-3,[2] the issue here is whether Defendant was obligated to determine the DRIP's fair-market value from time to time, not whether the A-9 Form S-3's "our units" language is ambiguous. *See generally*, Am. Compl.

Turning to the terms of the A-9 Form S-3, the contract provides that:

> . . . *unless our board of directors adopts a different method of determining market value* and price for our units for purposes of this plan, *the market value of our units and the unit price of units purchased from us under the plan* will not be based on an appraisal or other valuation of us, our net assets, or the units, and will not necessarily reflect our value, earnings, net worth or other measures of value, but rather *will be deemed equal to the most recent price at which an unrelated person has purchased our units from us*.

Def.'s Mem. Ex. 2 at 7 (emphasis added). Accordingly, under the plain language of the A-9 Form S-3, absent an exercise of contractual discretion by A-9's board of directors, the price of the DRIP units is the most recent price at which an unrelated person purchased A-9's units from A-9. *Id.*

---

[2] The language in the A-9 Form S-3 regarding "our units" was modified to include "from us," so as to read "will be deemed equal to the most recent price at which an unrelated person has purchased *our units from us*." *See*, Def.'s Mem. Ex. 2 at 7 (emphasis added). This modification was made with the express purpose of removing the ambiguity identified in *Wenzel* and *Wilchfort*. *See*, Pl.'s Opp'n at 7.

Plaintiff contends that this interpretation of the A-9 Form S-3 renders superfluous its language regarding valuation methods for the DRIP units.  *See*, Pl.'s Opp'n at 11.  However, to the contrary, the contract's valuation method language is better understood to describe the alternate methods that *could* be used by A-9's board of directors if it *was* to exercise its contractual discretion to re-value the units.  *See, e.g.*, *Wilchfort*, 307 F. Supp.3d at 74.

Plaintiff further alleges that, "[i]mplied as part of the contract was the agreement and undertaking to determine a fair market value for the A-9 units to be paid to Plaintiff and Class members in lieu of the dividend."  Am. Compl. ¶ 48.  Plaintiff provides no further support for this position, and the Court finds it contrary to the plain language of the A-9 Form S-3, which expressly states how the DRIP units would be valued.  This Court thus concurs with the reasoning of the *Wenzel* and *Wilchfort* courts and finds that, reading the A-9 Form S-3 as a whole, there was no enforceable obligation to re-value the DRIP unit price from time to time.

### B. Definition of "Unrelated Persons"

Plaintiff argues that Defendant breached its obligations under the A-9 Form S-3 because the $10.25 price used throughout the Class Period was not, in fact, the "most recent price paid by an unrelated person to A-9 for a unit."  Pl.'s Opp'n at 9.  Plaintiff contends that the $10.25 price was the price paid by existing unitholders, "who cannot be considered 'unrelated' to A-9 because they are *owners* of A-9, however small."  *Id.* (emphasis in original).  In support of this argument, Plaintiff relies on definitions of "unrelated" from the *Cambridge English Dictionary* ("not having a connection") and *Merriam Webster Dictionary* ("not connected in any way"), as well as the definitions of "related party transaction" in *Investopedia* ("a deal or arrangement between two parties who are joined by a pre-existing business relationship or common interest") and *Wikipedia* (a transaction "between two parties who hold a pre-existing connection prior to the transaction").

*Id.* As a result, Plaintiff argues, the last time a "true unrelated person" purchased A-9 units from A-9 was in "2007 through 2008," at a price reflecting "the value of a company with a book value of $9.50 per unit." *Id.* at 9.

Plaintiff's argument is unpersuasive. The term "unrelated persons" has a specific meaning when used in financial filings such as the A-9 Form S-3. Plaintiff acknowledges that the A-9 Form S-3 is governed by SEC Regulations. Am. Compl. ¶ 27. SEC Regulations define "related persons" as including directors, executive officers, and not including all existing shareholders, *See*, 17 C.F.R. § 229.404 (Item 404). Other financial definitions of the relevant terms are in accord. *See, e.g.*, 26 U.S.C. § 267 (IRS definition of "related persons"); FASB Accounting Standards Codification Topic 850-10 (providing "Examples of related party transactions").

Moreover, the plain language of the A-9 Form S-3 strongly suggests that the term "unrelated persons" is not intended to exclude all owners of A-9 units. The A-9 Form S-3 states that "[t]he most recent price paid by an unrelated person to us for a unit was $10.25 on January 15, 2013 which was the most recent date a dividend was paid by the Company." Def.'s Mem. Ex. 2 at 7. Plaintiff concedes this was a transaction by an existing unitholder. *See*, Pl.'s Opp'n at 9-10. Under Virginia law, "[t]he guiding light in the construction of the contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Meade v. Wallen*, 226 Va. 465, 466 (Va. 1984). Accordingly, the A-9 Form S-3 should be read to use the term "unrelated person" to exclude, *inter alia*, directors and executive officers, who might have purchased, or have the option to purchase, units at prices different from those available to the public.

The *Wilchfort* court noted that the *Wilchfort* and *Wenzel* litigations "not only share the same claims and theories of liability but also the same counsel," and cautioned counsel that

8

"[a]ttempts to manufacture multiple bites at the same apple will not be rewarded." *Wilchfort*, 307 F. Supp.3d 64, 74 & n.18.  In advancing those same claims and theories of liability again here, Plaintiff's counsel evidently has chosen to disregard that warning.  Thus, Plaintiff's claim for breach of contract is dismissed with prejudice.

**III. Implied Covenant of Good Faith and Fair Dealing**

Under Virginia law, "the elements of a claim for breach of an implied covenant of good faith and fair dealing are (1) a contractual relationship between the parties, and (2) a breach of the implied covenant." *Enomoto v. Space Adventures, Ltd*, 624 F. Supp.2d 443, 450 (E.D. Va. 2009) (citing *Charles E. Brauer Co., Inc. v. NationsBank of Va., N.A.*, 251 Va. 28, 34 (Va. 1996).  There are "two ways in which the duty of good faith and fair dealing may be breached:  (1) where a party has a clear contract right, even if its exercise would arguably be arbitrary, that party is only forbidden from acting dishonestly, (2) but where a party has discretion in performance, that party cannot act arbitrarily or unfairly." *Stoney Glen, LLC v. S. Bank & Trust Co.*, 944 F. Supp.2d 460, 466 (E.D. Va. 2013) (citations omitted), *clarified on denial of reconsideration*, 2013 WL 4539736 (E.D. Va. 2013).

As courts have acknowledged, "Virginia law on the implied duty of good faith and fair dealing is not exceptionally clear." *Stoney Glen*, 944 F. Supp.2d 460, 467; *Wilchfort*, 307 F. Supp.3d at 77 (same).  In a trio of decisions in the 1990s, the Supreme Court of Virginia sought to define the scope of the implied covenant under Virginia law.  In *Charles E. Brauer Co.*, relying on its decision in *Mahoney v. NationsBank of Virginia, N.A.*, 249 Va. 216, 221 (Va. 1995), the Supreme Court of Virginia held that, "when . . . parties to a contract create valid and binding rights, one party does not breach the [Uniform Commercial Code's ("U.C.C.")] obligation of good faith by exercising such rights," 251 Va. at 33 (Va. 1996).  Subsequently, in *Ward's Equipment, Inc. v.*

9

*New Holland N. Am., Inc.*, 254 Va. 379 (1997), the court expanded this doctrine beyond U.C.C. contracts, holding that, "when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights." *Id.* at 385.

One year after *Ward's Equipment*, in *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535 (4th Cir. 1998), the U.S. Court of Appeals for the Fourth Circuit distinguished *Charles E. Brauer* and *Mahoney*, and held that "it is a basic principle of contract law in Virginia, as elsewhere, that although the duty of good faith does not prevent a party from exercising its explicit contractual *rights,* a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party." *Virginia Vermiculite*, 156 F.3d at 542 (emphasis in original).

Here, Plaintiff alleges that the A-9 Form S-3 gave A-9's board of directors discretion to re-price the DRIP units under certain circumstances, and that A-9 breached the implied covenant by: (i) exercising its discretion unfairly, arbitrarily, and in bad faith by maintaining the $10.25 per unit price when the actual fair market value of the units was considerably less than $10.25; and (ii) exercising its discretion unfairly by failing to establish any procedures to re-evaluate the DRIP price. Am. Comp. ¶¶ 4, 68-69. Defendant advances several arguments to support dismissal of Plaintiff's implied covenant claim, although each appears simply to rehash Defendant's disagreement with the distinction between contractual rights and discretion drawn by the Fourth Circuit in *Virginia Vermiculite*.

First, Defendant notes that, under Virginia law, a party does not breach the implied duty of good faith and fair dealing when it exercises valid and binding rights created under a contract. Def.'s Mem. at 9. Here, however, Plaintiff alleges that Defendant breached the implied duty

through its bad faith exercise of its contractual *discretion*. *See*, Am. Compl. ¶¶ 68-69. This allegation may state a claim under Virginia law. *See*, *Virginia Vermiculite*, 156 F.3d at 542.

Next, Defendant contends that, "in a series of three opinions, the Supreme Court of Virginia clearly barred the claim Plaintiff now presses." Def.'s Mem. at 10 (citing *Mahoney*, 249 Va. 216; *Charles E. Brauer Co.*, 251 Va. 28; *Ward's Equipment, Inc.*, 254 Va. 379). As discussed above, *Virginia Vermiculite* expressly found that neither *Brauer* nor *Mahoney*, which dealt with valid and binding contractual rights, is inconsistent with its holding that the implied covenant prevents a party from exercising contractual discretion in bad faith. *See*, *Virginia Vermiculite*, 156 F.3d 535, 542. *Ward's Equipment*, which held that "when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights," 254 Va. at 385, is distinguishable on the same grounds. *See*, *Virginia Vermiculite*, 156 F.3d at 542; *See also*, *Barton v. Capital One Bank (USA), N.A.*, 2013 WL 12173918, at *6 (N.D. Cal. Apr. 16, 2013) (analyzing *Mahoney*, *Charles E. Brauer Co.* and *Ward's Equipment*, and "find[ing] the reasoning of the *Virginia Vermiculite* court persuasive.")

Moreover, while Defendant asserts in a footnote that *Virginia Vermiculite*'s "strained distinction between 'rights' and 'discretion' is a significant departure from several pronouncements of Virginia law by the state's highest court," Def.'s Mem. at 10 n.4, Virginia courts continue to cite *Virginia Vermiculite* precisely for that distinction, *See, e.g.*, *Lowe v. Wells Fargo Bank, N.A.*, 2018 WL 3748418, at *10 (E.D. Va. July 9, 2018) ("The implied covenant does not apply when parties to a contract create valid and binding rights, though contractual discretion may not be exercised in bad faith." (citing *Virginia Vermiculite,* 156 F.3d at 542) (citation and internal quotation marks omitted)); *Tedders v. Bank of Am., N.A.*, 2015 WL 13373860, at *3 (Va. Cir. Feb. 4, 2015) ("The duty of good faith does not prevent the exercise of contractual rights

11

but rather limits the exercise of contractual discretion." (citing *Virginia Vermiculite,* 156 F.3d at 542)); *Wachovia Bank, N.A. v. Ranson Tyler Chevrolet, L.L.C.*, 2007 WL 6013146, at *5 (Va. Cir. Mar 27, 2007) ("While the duty of good faith cannot contradict unambiguous rights, 'a party may not exercise contractual discretion in bad faith.'" (quoting *Virginia Vermiculite,* 156 F.3d at 542)).

Next, Defendant argues that Plaintiff has not alleged a viable implied duty claim under *Wilchfort*. Def.'s Mem. at 12-13. The Court finds that at least one of Plaintiff's two theories of breach of the implied covenant is not viable, *i.e.*, that "Defendant exercised its discretion unfairly by failing to establish any *procedures* to re-evaluate the DRIP price." Comp. ¶ 4, 68-69 (emphasis added). As stated in *Wilchfort*, "[t]o be viable, this theory requires an affirmative obligation to reassess the price or methods of valuation from 'time to time'—an argument unsupported by the Forms S-3." 307 F. Supp.3d at 77. "Defendant[] cannot be said to have acted in bad faith for failing to establish procedures for an obligation that does not exist." *Id.*

As to Plaintiff's other theory of breach of the implied covenant, that Defendant exercised its discretion unfairly, arbitrarily, and in bad faith by maintaining the DRIP unit price when the actual fair market value of the units was considerably less, Am. Compl. ¶ 68, *Wilchfort* counsels against dismissal. The *Wilchfort* court drew a parallel between Apple REIT's conduct and *Virginia Vermiculite*:

> "As in *Virginia Vermiculite*, Defendants retained the 'sole discretion' to act or not act to reassess the price of units, impacting the benefits conferred to the other party to the contract. In addition, in both cases, defendants refused to exercise such discretion. Moreover, defendants in both cases allegedly declined to exercise such discretion purely out of self-interest, without consideration of the interests and welfare of the other parties to the contract, working effectively to directly injure the interests of the other parties."

*Wilchfort*, 307 F. Supp. 3d at 77-78. The same reasoning applies here.

Finally, Defendant attempts to distinguish *Wilchfort* on the facts, arguing generally that there are no factual allegations to support a claim for breach of the implied duty and specifically that: (1) Plaintiff offers only conclusory and threadbare allegations in support of the theory; and (2) Plaintiff's own allegations make clear that Defendants did not decline to reprice the shares solely out of self-interest, despite knowledge of their overvaluation,. Def.'s Mem. at 12-13. However, the Amended Complaint plausibly alleges that: (1) A-9 knew or should have known that its shares were worth significantly less than the DRIP unit value of $10.25 per share; (2) A-9 reported financial statements to class members that overstated A-9's income and book value; and (3) A-9 maintained the $10.25 unit price to conserve cash at a time when other Apple REITs were forced to borrow cash from A-9. Am. Compl. ¶¶ 39, 42, 9, 8. The Court thus finds that Plaintiff plausibly has alleged that A-9 breached the implied duty of good faith and fair dealing by exercising its contractual discretion not to re-value the DRIP units arbitrarily and in bad faith.

## CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss is granted with prejudice as to the breach of contract claim, but denied as to the breach of the implied covenant of good faith and fair dealing claim. This action is referred to the magistrate judge for further pretrial proceedings.

SO ORDERED.

Dated: Brooklyn, New York
       March 31, 2020

>                            /s/
>                    DORA L. IRIZARRY
>                 United States District Judge